```
 1                IN THE UNITED STATES DISTRICT COURT

 2               FOR THE EASTERN DISTRICT OF TEXAS

 3                         MARSHALL DIVISION

 4   DROPLETS, INC.                 )(

 5                                  )(     CIVIL DOCKET NO.

 6                                  )(     2:11-CV-401-JRG-RSP

 7   VS.                            )(     MARSHALL, TEXAS

 8                                  )(

 9   EBAY, INC., ET AL.             )(     NOVEMBER 25, 2014

10                                  )(     2:00 P.M.

11                          MOTION HEARING

12            BEFORE THE HONORABLE JUDGE ROY S. PAYNE

13                 UNITED STATES MAGISTRATE JUDGE

14

15   APPEARANCES:

16   FOR THE PLAINTIFF:  (See sign-in sheets docketed in
                          minutes of this hearing.)
17

18   FOR THE DEFENDANTS: (See sign-in sheets docketed in
                          minutes of this hearing.)
19

20   COURT REPORTER:    Ms. Shelly Holmes, CSR-TCRR
                        Official Reporter
21                      United States District Court
                        Eastern District of Texas
22                      Marshall Division
                        100 E. Houston Street
23                      Marshall, Texas  75670
                        (903) 923-7464
24

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
```

1

                         I N D E X
2

3    November 25, 2014

4                                              Page

5         Appearances                          1

6         Hearing                              3

7         Court Reporter's Certificate        46

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            LAW CLERK:  All rise.

 2            THE COURT:  Good afternoon.  Please be seated.

 3            For the record, we're here for the motion hearing in

 4   Droplets, Inc., versus Overstock.com, et al., which is 2:11-401

 5   on the docket.

 6            Would counsel state their appearances for the record?

 7            MR. BUDWIN:  Josh Budwin and Sam Baxter on behalf of

 8   Droplets.

 9            THE COURT:  All right.  Thank you, Mr. Budwin.

10            MR. BARR:  John Barr and Chris Shield on behalf of the

11   Defendants.

12            THE COURT:  All right.  Thank you, Mr. Barr.

13            All right.  Mr. Budwin, we're here on your motion, and

14   on discovery matters like this, I always like to hear first

15   whether there have been any changes since the motion was filed.

16   If you would address that.

17            MR. BUDWIN:  So, Your Honor, since the filing of the

18   opening brief, my understanding is the Defendants have now

19   completed their document production.  We have a dispute over

20   the sufficiency of Defendants' privilege log which relates to

21   that document production.  The privilege log is approximately

22   3,000 entries, and so there may be additional documents to be

23   produced as part of that dispute, but the underlying documents,

24   it's my understanding, they've all been produced.

25            THE COURT:  All right.  And I understand the -- the
```

1   relief you were seeking when the briefs were last filed.  Has

2   there been any further change in that?

3        MR. BUDWIN:  Your Honor, we feel that we need some

4   form of relief.  We believe that the relief that we've asked

5   for, which is the exclusion of the custodians as trial

6   witnesses, is the proper relief.  The documents in question are

7   very material to our case.  We've now served a supplemental

8   expert report on damages.  We've found documents that we

9   believe are highly important that show, you know, over a

10  hundred million dollars of additional revenue for at least the

11  Overstock Defendants.

12        And in light of that, the late production of these

13  important documents, you know, not just after the close of

14  discovery on September 1st but substantially after the Court's

15  October 2nd deadline, the documents productions weren't

16  complete until October 22nd or October 23rd, notwithstanding

17  the issues of the privilege log.

18        And during that time, we've been working on all the

19  pre-trial filings.  I believe there were four or five motions

20  that we filed yesterday -- responses, trial exhibit lists,

21  things of that nature.  And both parties have documents from

22  this late production on their trial exhibit list.

23        THE COURT:  And -- and who are the witnesses whose

24  exclusion you would seek as a sanction?

25        MR. BUDWIN:  The custodians of these emails.  I can

```
 1  give you a list of the names.
 2          THE COURT:  That'd be helpful.
 3          MR. BUDWIN:  So this is on Page 10 of our motion.
 4  It's in Footnote 3 and 4.  For Overstock, it's Amit Goyal, Seth
 5  Moore, Samuel Jacob Peterson, Ben Ellis, Jeremy Johnson, and
 6  I'm going to mispronounce this name, Padmakiran Guttikonda, and
 7  then for Sears, it's Rhett Butler, Anna Cerrito, Colleen Fay,
 8  Pankaj Khanna, Veera Sekhar, Alfred Zhao, and Marty McHugh.
 9          THE COURT:  All right.  Thank you.  I see those in
10  Footnote 3 and 4.  All right.
11          Okay.  Mr. Barr?
12          MR. BARR:  Thank you, Your Honor.
13          Your Honor, you'll recall we were down here on
14  September 18th for a hearing on a number of matters, one of
15  which was brought up by the Plaintiff which was ESI.  And at
16  that time, the Court looked at the motion and looked at the
17  exchange of correspondence between the parties, and I believe
18  the Court remarked that it appeared that the parties were
19  working through these issues.
20          And we had some more discussion, and you asked me when
21  I thought that my clients could complete production of ESI.
22  And I told you at that time that I thought two weeks would be
23  the outside, but I thought that we could do it more quickly.
24          So you signed an order, and you put two weeks, which
25  was October the 2nd, as the time by which we should complete
```

```
 1   ESI.

 2          Sears completed their ESI by October 2nd.  Overstock

 3   did not.  Overstock did not complete its ESI until October 8th.

 4   We actually started a rolling production on October 4th.  We

 5   took until October 8th to complete that.  The parts of the

 6   production that went until October 22nd related to the

 7   privileged documents that were on the privilege log.

 8          THE COURT:  Well, all right.  Tell me something now,

 9   when you say that Sears completed its production, you are

10   excepting from that the privilege log; is that right?

11          MR. BARR:  That's right, Your Honor.

12          THE COURT:  And were there documents that were

13   withheld from that production on October 2nd that ultimately

14   were determined not to be privileged?

15          MR. BARR:  There were.  The way that this worked, and

16   Your Honor may remember that there was considerable back and

17   forth about the ESI terms.  Droplets did not get the ESI terms

18   to the Defendants in this case until a day or two before the

19   close of discovery.  And we had gone back and forth for many

20   months.

21          I think the first set of ESI terms were provided to us

22   in July, and we went back and forth many months because the

23   first set of terms that we provided were so broad, that it

24   ended up being over four million emails.  And so the parties

25   went back and forth, and we actually tried to assist Droplets
```

1    and did assist Droplets in coming up with terms that were more

2    targeted towards what they want so that we'd return a

3    reasonable number of emails.

4            Now, get to your -- to get to your question directly,

5    we did -- we produced everything that did not hit a privilege

6    screen.  There was a privilege screen that was put in both on

7    the Overstock and the Sears productions which frankly was done

8    with two different vendors.  And there were documents that hit

9    the privilege screen.

10           Those were then reviewed -- there's some affidavits

11   attached to our response from Mr. Holbrook on behalf of Sears

12   and from Mr. Nickle on behalf of Overstock.  And both the

13   in-house lawyers and outside counsel at my firm then reviewed

14   the documents that hit the privilege screen.  And as we did

15   that, I believe we produced additional documents that were --

16   that we deemed not to be privileged or we were willing to get

17   past that.

18           There are additionally some documents from Sears that

19   have attorney/client information in there, and I've -- I've

20   offered to Mr. Budwin a month ago, I think, now, that if he

21   would just agree that giving him those documents would not act

22   as a general waiver of attorney-client privilege, we would take

23   those off the privilege log, as well.  But he hasn't responded

24   to that offer.

25           THE COURT:  Well -- so do you believe that by October

1    the 2nd, Sears had complied with the order?

2         MR. BARR:  Yes, I do, Your Honor.

3         THE COURT:  Did the order say you should produce

4    everything that you -- that you have not reviewed or that you

5    have reviewed for privilege or --

6         MR. BARR:  I don't think the Court's order got that

7    specific.  I've got the transcript.  Let me -- if you'd -- let

8    me grab it real quick.

9         Specific -- specifically, I think the Court just

10   picked a date, and I don't have the order in front of me, but

11   my recollection of it was that we were just asked to provide --

12   produce the documents, and my understanding of that was that

13   if they were privileged documents, that would be -- those

14   documents would be put on a privilege log, and, in fact, they

15   were, and then we would review those privilege documents as --

16   as soon as possible, which we have, and would produce those

17   that were not privileged, which we have.

18        THE COURT:  Now, you've been at this a long time, I

19   know.  I have, too.  An order to produce does not mean produce

20   everything except that which you want to look at to see if it's

21   privileged, does it?

22        MR. BARR:  No, sir.  But these -- these were documents

23   that we had put -- the privilege screen that was put up -- of

24   course, we're dealing with millions of documents here, as the

25   Court, I'm sure, is aware because you've been doing this a long

1   time.  The -- the privilege screen had things like attorney

2   names, and that's the type of information that caused documents

3   to hit the privilege screen.  So the things that hit the

4   privilege screen were deemed to be privileged.

5          And what we've -- what we've done, then, is we've

6   spent hundreds of attorney hours in reviewing all those

7   documents to see if any of them are not privileged.  So

8   everything that was produced by the deadline was the things

9   that did not hit the privilege screen, and so, therefore, did

10  not have an attorney name or something of that nature that

11  caused it to hit the privilege screen.  And all of that

12  procedure is explained, also, in the affidavits.

13         THE COURT:  And I've read that.  And all of that is to

14  protect your clients' privileges, but none of that is

15  compliance with the order.  I mean, the order was to produce

16  the documents, right?

17         MR. BARR:  I don't believe the order said that we had

18  to produce all documents, including privileged documents.

19         THE COURT:  No, I understand that.  You have to

20  produce them or list them on a privilege log.

21         MR. BARR:  Which we did, by the deadline, except in

22  the extent of Overstock, which missed the deadline by six days.

23         THE COURT:  When did Sears provide its privilege log?

24         MR. BARR:  Let's see here, and I will note that as a

25  sanction, what the Plaintiff has asked for is striking all of

1  our witnesses for this.

2       MR. BUDWIN:  The initial logs were provided on October

3  29th, Your Honor, supplemental logs on November 7th.

4       THE COURT:  Mr. Barr, is that right?

5       MR. BARR:  Let me check my notes, Your Honor.

6       THE COURT:  Go ahead.

7       MR. BARR:  I don't have on here when the actual log

8  was sent over.  I do have a timeline which appears on Page 7 of

9  our response, which lays out how we did this by day.  So as of

10  October the 17th, Overstock's counsel had completed individual

11  review or approximately 14,500 Overstock emails and attachments

12  that were captured during the privilege search.  And then on

13  the 21st, Overstock's counsel completed necessary redactions to

14  the 14,500 emails and attachments during the privilege search

15  and Orange Legal, which was the vendor, began processing that

16  ESI.

17       And then on that same day, Sears completed individual

18  review of over 3,000 emails and attachments that were flagged

19  as privileged, and Sears' vendor, DTI, began processing that

20  ESI for privilege search.

21       And then October 22nd, the portion of the Sears ESI

22  that was initially captured by the privilege keyword search but

23  judged not to be privileged after individual review was

24  produced to the Plaintiff.

25       And then on the 23rd, the remaining ESI from Overstock

1    that was initially captured by the privilege keyword search but

2    judged not to be privileged after an individual review was

3    produced to Plaintiff.

4         And then on the 24th of October, all remaining Sears

5    ESI that was initially captured by the privileged keyword

6    search but judged not to be privileged after individual review

7    was produced to the Plaintiff.

8         THE COURT:  And my question goes back to whether or

9    not you had complied with the order, and I think the written

10   order says that you're ordered to produce emails in accordance

11   with the parties' agreed search terms no later than October

12   2nd, 2014.  And what that means to me is you produce them.  If

13   you're withholding something based on privilege, you provide a

14   privilege log for it.

15        MR. BARR:  And we certainly did that.  Again, it was

16   thousands and thousands of documents that had to be on that

17   log, and it took time to do that.  We never got their search

18   terms until August the 29th of 2014.

19        THE COURT:  I know, but that was before the hearing.

20        MR. BARR:  It was.

21        THE COURT:  And we were right here, you and I.  You

22   knew what you'd been ordered to do.  You had agreed to the

23   search terms.  You said, two weeks at the outside.  I took your

24   time.  I put it in here.  And I'm just trying to figure out if

25   you believe that by October 2nd that your clients had complied

1  with that order.

2      MR. BARR:  I believe that Sears had because we

3  produced everything that was not going to be hit -- that did

4  not hit the privilege screen.

5      THE COURT:  Where did -- so did they agree that if

6  something hit a privilege screen, you didn't have to produce

7  it?

8      MR. BARR:  Did -- did Droplets agree with that?

9      THE COURT:  Yeah.

10     MR. BARR:  We did not have that specific discussion.

11 I assumed that if it was privileged, that we didn't have to

12 produce it, and then we put it on a privilege log which did

13 take a few days to do.

14     THE COURT:  Okay.  But there were thousands of

15 documents that you withheld after October 2nd that turned out

16 not to be privileged, right?

17     MR. BARR:  I believe that -- I don't know the exact

18 number.  I'm sure there were lots of documents that were

19 produced that turned out not to be privileged.  I don't know if

20 it was thousands or hundreds.  I don't have any idea of how

21 many that was, Your Honor.

22     THE COURT:  Okay.

23     MR. BARR:  I'll have to go back and look.

24     THE COURT:  Okay.  I mean, I -- and you still contend

25 that you had complied with this -- this order?

1          MR. BARR:  I do, Your Honor.  I believe -- except for

2    Overstock.  I believe that Sears, since they had completed

3    their production, except for those documents that were -- hit

4    the privilege screen, that we produced those documents by

5    October 2nd as the Court ordered.  We worked throughout the

6    time.  And by the way, we did tell Droplets throughout what was

7    going on.  We had some vendor issues, as was put in the

8    affidavits that was attached to our response.  We worked very

9    hard to meet your deadline, and we worked constantly until we

10   could -- to get them done as quickly as we could, and that's

11   why we were -- started the rolling production on the 4th and --

12   and continued to the 8th on behalf of Overstock.  And we've

13   worked on them hard since this date.  And this is a huge volume

14   of documents, and it was done in a very expedited fashion,

15   given that we didn't have the search terms until the beginning

16   of September.

17         THE COURT:  Now, you agree then that Overstock did not

18   comply with the order?

19         MR. BARR:  Overstock did not get the production

20   completed by October 2nd; that is correct.  We got it completed

21   by six days later, October 8th.

22         THE COURT:  And is there any particular reason you did

23   not seek leave of Court?

24         MR. BARR:  The reason that we did not seek leave of

25   Court is because we were working to try to get it completed.

```
 1   All attorneys were working to try to get these documents
 2   reviewed.  At the same time, we were working on a number of
 3   other motions.  We believe that the -- the issue was to get
 4   this stuff done as quickly as we could.  That's what I
 5   understand the Court wanted.
 6            I did not take the time to ask the Court if we could
 7   have two more days.  We were working each day, hoping that by
 8   the end of that day, it would be completed.  And it ended up
 9   taking a few more days than we -- than we believed was --
10   was -- than we thought originally when I told you that I
11   thought it would be two weeks at the outside.
12            It certainly wasn't that we were taking the order
13   lightly.  We were working as quickly as we could to get the
14   order -- to comply with the order, and we recognized we weren't
15   going to be able to do so in regard to Overstock, and that's
16   why we continued working on that and sent that to the
17   Plaintiffs as quickly as we could.
18            THE COURT:  It just doesn't seem to me, Mr. Barr, like
19   you were treating it like an order.  It was more of just sort
20   of goal?
21            MR. BARR:  No, Your Honor, we were treating it like
22   an order.  We -- we were -- we treated it very -- we had -- we
23   put -- additional attorneys from my office were put onto this
24   project to review documents.  We took it extremely seriously.
25            THE COURT:  I just don't -- I -- I am really surprised
```

1    that once you determined you could not comply with the order,

2    that at that point, you decided that, well, we'll just do it

3    as -- you know, as quickly as we can or as we want to.

4            MR. BARR:  No, Your Honor, it wasn't -- it was not a

5    nonchalant deal at all.  We -- we realized that we were not

6    going to be able to meet the order, and we continued to work to

7    get it completed as quickly as possible.

8            THE COURT:  And yet the Plaintiff had to file another

9    motion.

10           MR. BARR:  He did not have to file another motion.

11   The Plaintiff has filed a number of motions because they want

12   to keep filing motions.

13           We've -- we've told the Plaintiff throughout that we

14   were working on this issue.  We -- and in regard to the

15   additional notice that he filed without leave this week saying

16   that we're not in compliance on the privilege log, there's an

17   email attached to our response that shows that I told him there

18   was no need to do that, that we would agree to do the things

19   that he asked in regard to the privilege log.  The ESI was

20   completed before this motion was -- was filed.

21           There -- you know, there was no showing in their -- in

22   their response of any prejudice.  There's been -- the cases all

23   say that -- that if there's no prejudice that -- and certainly

24   if there's anything that could be cured by a continuance, that

25   that should be done before there would be witnesses struck.

1    He's deposed these witnesses.

2             One of the other things that slowed down the ESI was

3    we were also taking the -- you remember that the Court asked

4    that we provide additional 30(b)(1) depositions, which we did

5    during this same time period.

6             One of those was Seth Moore who was an Overstock

7    witness.  The Plaintiff called and told us that they wanted us

8    to put Mr. -- make sure they had Mr. Moore's ESI available for

9    his deposition even though the deposition was not about

10   Mr. Moore's ESI.  In fact, it was a 30(b)(6) deposition that

11   had to do with interrogatory responses.  So we put Mr. Moore's

12   ESI ahead of the other ESIs which further slowed down the

13   process.  But we got Mr. Moore's ESI done.  They had -- they --

14   they moved the deposition, but they got Mr. Moore's ESI.  They

15   had it available to them when they took his deposition, and we

16   allowed them to question Mr. Moore about that ESI, even though

17   that was not the purpose of this deposition.

18            So we -- we did work very hard.  We certainly did not

19   take your order lightly.  You know, given the fact that you

20   asked me when I thought I could get it done, I -- I -- that was

21   my mistake.  I should have said, four weeks.  I had no idea --

22   as I said to the Court, that I didn't really know.

23            THE COURT:  You know, if you had said, four weeks,

24   that doesn't mean I would have said, fine.

25            MR. BARR:  No, I understand that.

1          THE COURT:  That was an order.  And it's true, I asked

2    you first, and you volunteered that deadline, which I used.

3    But it wasn't a just do your best, and, you know, if it doesn't

4    work out, it doesn't work out.

5          MR. BARR:  That wasn't my attitude, Your Honor, I

6    assure you.

7          THE COURT:  Well, that's what the record would

8    reflect.  And I -- frankly, I'm put off by the fact that you

9    continue to say that you produced everything timely except

10   privileged documents, when what you produced for Sears, at

11   least, was everything except the documents you wanted to look

12   at further to see if they were privileged.

13         MR. BARR:  No, it was only if once those documents hit

14   the privilege screen, that is included --

15         THE COURT:  The privilege screen is irrelevant.

16   That's something that is adjusted by your client to fit

17   whatever they want.

18         The documents you don't have to produce are the ones

19   that are privileged, not the ones that hit some privilege

20   screen that your client has confected.  There's nothing that

21   says you don't have to produce something which may be

22   privileged.

23         MR. BARR:  I agree with that, Your Honor.

24         THE COURT:  So if you're going to rely on a privilege

25   screen, it better be good or you better do it in time to

1    produce the documents timely that aren't privileged.  And I --

2    apparently we're not talking about a small number of documents.

3    If I look at -- read these briefs right, you produced a very

4    large number of documents between October 22 and 24, some three

5    weeks after the deadline.  And that was -- I know your -- your

6    pleadings don't have numbers of documents in them, but I think

7    that the Plaintiff's represented that it was some six-figure

8    number.

9           MR. BUDWIN:  Your Honor, it's the first page of our

10   reply, and my declaration attached to our reply, Docket 275,

11   has all the documents attached.

12          THE COURT:  And what is the number of documents that

13   were produced in that period in late October?

14          MR. BUDWIN:  So between October 22nd and 24th, 2014,

15   Sears produced 23,000 documents, 180,000 pages.  Overstock

16   produced 12,500 documents, 119,000 documents pages -- more --

17   more than 119,000 pages.  The page count is around that.

18          THE COURT:  So basically 250,000 pages were produced

19   at that point?

20          MR. BUDWIN:  So it's actually almost 300,000, Your

21   Honor.

22          THE COURT:  All right.  Mr. Barr, what about those

23   documents?

24          MR. BARR:  Your Honor, these -- what these were was

25   emails with attachments.  And so the attachments, I think, is

1   what accounts for the large page count, and I'm not sure if

2   that page count is correct or not.  I'll have to go back and

3   check that.  But that -- that is -- that is why we have large

4   page counts.  But that shows the scope of what we were looking

5   at here, Your Honor.

6         There were millions of emails which had millions of

7   attachments and -- for both clients.  And we looked through

8   these in a very short period of time.  We had numerous

9   attorneys, in-house and outside, and vendors looking on it.

10  Sears test -- in -- in their affidavit, they put that they

11  spent $77,000.00 just doing this document production.  So this

12  is something that was all hands on deck, and we were working on

13  it to try to get it completed.

14        THE COURT:  And, you know, I guess it would be easier

15  for me to deal with that if I could believe what I'm reading in

16  here.  You're -- you're telling me that Sears produced, by

17  October 2nd, everything it was supposed to produce, and then

18  three weeks later they produced 130,000 pages of documents.

19        Now, if they had produced everything they're supposed

20  to by October 2nd, why did they produce another 130,000 pages

21  three weeks later?

22        MR. BARR:  Your Honor, I don't know what the total

23  volume -- originally, it was four million emails.  So the

24  volume of documents is huge.  So 130,000 pages sounds like a

25  lot when we talk about it here, but I think in the context of

1  all the documents that were gone through and that were produced

2  in this case, it's not a huge number.

3        THE COURT:  But those were non-privileged documents,

4  right?

5        MR. BARR:  Those were documents that hit the privilege

6  screen originally because they had an attorney's name in them

7  or one of the other factors that was -- that was used on the

8  privilege screen.  And then they were manually reviewed to make

9  sure that either they were not privileged or that they were

10  privileged but we were willing to waive that and produce it in

11  this case.

12        THE COURT:  And so your answer is those 130,000 --

13        MR. BARR:  And, Your Honor --

14        THE COURT:  -- pages were not privileged?

15        MR. BARR:  Well, and I'm -- and I'm getting

16  information now that Sears only produced 2,000 documents that

17  were -- you say they were on the privilege log?

18        MR. SHIELD:  They were -- there was 3,600 documents

19  originally on the privilege log, 2,000 were produced.

20        MR. BARR:  Okay.  3,600 documents were originally on

21  the privilege log for Sears, and -- and 2,000 of those

22  documents were subsequently produced.  I don't know how many

23  pages that is.

24        THE COURT:  Well, then you disagree with the figures

25  that the -- the Plaintiff just provided me?

```
 1            MR. BARR:  Apparently so, Your Honor.

 2            THE COURT:  All right.  And -- and what do you think

 3   the accurate page -- numbers are as to what you produced during

 4   that period, October 22 through 24, from each of your clients?

 5            MR. BARR:  As far as the total number of pages?

 6            THE COURT:  I'll take either.

 7            MR. BARR:  Okay.  Can I have a second, Your Honor?

 8            THE COURT:  Yes.

 9            MR. BARR:  Thank you, Your Honor.  I've got some

10   updated numbers for you.

11            THE COURT:  All right.

12            MR. BARR:  So original -- the original production from

13   Sears was 21,000 documents -- 21,000 emails, which was 430,000

14   pages.

15            THE COURT:  And -- and that was --

16            MR. BARR:  That was pre -- pre-screen.  That was what

17   we produced that was not -- that did not hit the screen.

18            THE COURT:  That's what you produced on October 2nd?

19            MR. BARR:  Yes, sir.

20            THE COURT:  And tell me those numbers again.

21            MR. BARR:  21,000 emails, 430,000 doc -- pages.

22            And, Your Honor, this is us doing the math here as

23   best we can, so that's the best we can do here at this point.

24            And then post-screen, we produced 2,000 of those

25   documents.  So of the original 21,000 for Sears -- I'm sorry,
```

1  there were 2,000 additional documents produced that were --

2  that had hit the privilege screen.

3          THE COURT:  And when were they produced?

4          MR. BARR:  Those were the ones that was the rolling

5  production -- I think October 22nd -- 23rd -- let me see,

6  Sears, I think, was the 22nd.  Let me just check my notes.

7  Sears was the 22nd, sir.

8          THE COURT:  Another 2,000 documents, and how many

9  pages?

10          MR. BARR:  I -- I don't have the page count on that,

11  Your Honor --

12          THE COURT:  All right.

13          MR. BARR:  -- yet.

14          In regard to Overstock, there were 115,000 emails

15  originally produced, which was 800,000 pages.

16          THE COURT:  Which was produced when?

17          MR. BARR:  Those started on the 4th and rolled through

18  to the 8th.

19          And then we had a supplemental production from

20  Overstock that started on the 23rd, and that was 11,000

21  documents.  And I don't have a page count on that.

22          THE COURT:  And tell me what you're saying the

23  Overstock production was on October 4 through 8.

24          MR. BARR:  115,000 documents -- emails, which was

25  800,000 pages.  So 115,000 emails, which was 800,000 pages.

1          And then Sears was 21,000 emails, which was 430,000

2    pages.  That was the original production on October 2nd for

3    Sears.

4          THE COURT:  So the production on October 22 and 23 of

5    2,000 documents for Sears and 11,000 documents for Overstock,

6    those were all documents that should have been produced on

7    October 2nd?

8          MR. BARR:  Well, perhaps.  I mean, they may have been

9    documents that we -- that hit the -- that were legitimately

10   privileged, but we decided to waive privilege.  They were

11   documents that were from lawyers, but we -- we took a -- we

12   tried to be overly productive and produce things.

13         So if they were documents that didn't relate to this

14   case that had lawyers' advice, perhaps we produced those.

15   There were things of that nature, Your Honor.  So we might have

16   had some legitimate claims to those documents is what I'm

17   trying to say as far as privilege, but we may have waived them

18   simple to -- to produce things.

19         THE COURT:  But you're not in a position to say

20   whether or not any of them were actually privileged, just they

21   might have been?

22         MR. BARR:  No, certainly some of them that are on the

23   privilege screen still are, and we have a privilege log for

24   both Overstock and Sears that has privileged documents on it.

25         THE COURT:  I'm talking about the ones that were

1    produced on October 22 and 23.

2         MR. BARR:  Well, they would have had to have a reason

3    to hit the privilege log, and the main thing I'm thinking of

4    with the pri -- privilege log was attorney -- the names of the

5    in-house counsel and outside counsel.  So if those documents

6    had that, they would have hit the screen.  I'm not sure if

7    there were any other criteria, but I know those were some of

8    the primary criteria, were inside and outside counsel.

9         And as you know, sometimes you'll have a lawyer copied

10   on something that isn't actually privileged.  And just having a

11   lawyer doesn't make it privileged, so we went back through and

12   looked at those, and if we found that this was not something

13   where legal advice was being sought, we would have produced

14   that in -- in the subsequent production.

15        THE COURT:  You understand that -- that a privilege

16   log is something that has to be produced at the time the

17   documents being requested are due?

18        MR. BARR:  I -- I did not understand that in regard to

19   this ESI production that we would have to do the privilege log

20   at the same time as the production was due.  Due to the volume

21   of documents that we were dealing with, I did not realize that,

22   Your Honor.

23        THE COURT:  Well, is there some exception for you --

24   I'm just -- I've never run across a situation before where the

25   belief was that documents that were -- that were going to be

1    further looked at for privilege could be produced after the

2    deadline whenever it was convenient.

3           MR. BARR:  That was not our belief here.  These were

4    documents that hit a privilege screen, so we knew that they

5    either had an attorney name on them or some other basis for

6    privilege.  That's why they were pulled.  It wasn't that we

7    just set them aside and said we're going to look at them at our

8    convenience.  They hit the screen.  We produced everything that

9    we could as quickly as we could that did not hit the screen.

10          Those that -- that hit the screen, we jumped on that

11   as quickly as we could to review those to make sure that

12   nothing had been overly inclusive in that screen and that we

13   had produced everything that was responsive, which is -- which

14   is how we handled it, Your Honor.

15          THE COURT:  Okay.  All right.  Well, I understand your

16   position.

17          MR. BARR:  And then -- and then secondly, Your Honor,

18   we would argue that the -- we've not been sanctioned in this

19   case for discovery.  We have not been hit with any discovery

20   abuse.  We -- throughout this case, we have complied with

21   discovery, and that striking our witnesses would be an extreme

22   death penalty sanction.  This would be a situation that, number

23   one, we don't think there's any priv -- any -- any prejudice

24   because this was finished three months before trial or almost

25   three months before trial, and the -- the Plaintiff did not

1    identify any prejudice in their motion, nor did they ask for a

2    continuance.  But if they did ask for a continuance as a result

3    of this, we certainly would not oppose a continuance that would

4    give them more time if they thought that they needed it as a

5    result of this six to -- if we want to say -- you know, six-day

6    delay for Overstock, and -- and if you want to say until all

7    the privileged documents were reviewed, another couple of

8    weeks.

9           But we certainly wouldn't oppose a continuance if they

10   needed it in order to rectify any harm as a result of that.

11          THE COURT:  Why isn't it prejudicial to have documents

12   produced after you've already taken the depositions of the

13   persons who produced them?

14          MR. BARR:  These documents in all events would have

15   been produced after we took the depositions because we never

16   even got the ESI terms until after discovery was over.  So they

17   would never have had these documents in time to take the

18   depositions.

19          In this case, the ESI was done last, after all of the

20   other discovery had been done.  And this case is a little

21   unusual because it was stayed for about two years.  And so the

22   case was filed, and then it was stayed for a number of reasons.

23   It kind of bounced around from Texarkana to Tyler to here

24   to -- to -- it bounced around twice in Tyler, Judge Davis then

25   Judge Schneider, then to this Court, so there was a -- and then

1    there was an MDL proposed, so there was a number of things

2    procedurally that happened which is why not much was done in

3    connection with discovery.

4         And then it was not until late July that the parties

5    even got -- I think early July is when the Plaintiffs first

6    even gave us some ESI custodians for Overstock only, not even

7    for Sears, and then they didn't give us the terms until August

8    29th, right before the Labor Day weekend for Overstock.  We

9    didn't get the Sears terms until September 9th.  So we're

10   talking about four million emails for Sears.  We didn't even

11   have the ESI terms until September 9th.

12        We had this hearing on September 18th, and we got all

13   this done less than a month later, by the end of October, so

14   this was a huge project, and we took it very seriously, and we

15   put a lot of resources into it.

16        THE COURT:  And, Mr. Barr, what do you think the Court

17   ought to do when a deadline is set and -- and it's not complied

18   with?

19        MR. BARR:  Well, Your Honor, I think if there was

20   prejudice, that the Court should grant a continuance to the

21   Defen -- to the Plaintiffs in this case if there was some

22   prejudice.  I don't think there was prejudice here, and I

23   certainly -- you know, I think under the circumstances, the way

24   we had this hearing and the way we're talking about the

25   deadlines, and I thought the Court -- I certainly did the best

1    I could and thought that this would be a reasonable deadline.

2    There were a number of reasons, as we outlined in our

3    affidavits attached to the motion that show why the deadline

4    was not met.  None of those related to us taking it not

5    seriously or not trying.

6         THE COURT:  You say, the way we had the hearing and

7    the way we talked about it?

8         MR. BARR:  Yes, Your Honor.  You asked me when I

9    thought that it could be done, and I -- and I told you the two

10   weeks.

11        THE COURT:  You think -- am I just too friendly?

12        MR. BARR:  I do think the Court is very friendly to

13   counsel, and I appreciate that.  I'm not implying that I did

14   not take it seriously, and I think our -- the evidence here

15   shows that we did take it very seriously, and we tried to

16   comply with it, and we did comply with it as to Sears.

17        I understand the Court disagrees with that in regard

18   to the -- the privilege log being -- not being completed, but

19   there will be no way to get that privilege log completed and

20   have these done by October 2nd under the circumstances with,

21   you know, 430,000 pages of documents and 800,000 for -- for

22   Overstock.  We -- we worked -- as outlined in the affidavits,

23   we spent hundreds of hours, tens of thousands of dollars, we

24   worked non-stop.

25        THE COURT:  Do you do that in the Court of Appeals?

1   Do you just -- if your brief is due by October 2nd and you just

2   haven't finished the research yet, there's a bunch of cases to

3   look at, you just file it three weeks later and tell the Court

4   of Appeals you've been working hard?

5           MR. BARR:  I -- I certainly wouldn't, Your Honor, and

6   I --

7           THE COURT:  You would actually comply with that

8   deadline?

9           MR. BARR:  I would, and I -- and I -- I assure you

10  that I did not disregard your deadline intentionally.  And I --

11  if -- if -- if the Court feels that we disregarded the

12  deadline, the fault is mine.

13          THE COURT:  Well, the --

14          MR. BARR:  I did not intend to do that.

15          THE COURT:  The -- when you pass the deadline

16  knowingly and you do nothing about it --

17          MR. BARR:  We -- we kept working to get the -- to

18  meet -- we were hoping each day after that that we could get it

19  done, Your Honor, and that's what we were doing.  So I

20  apologize.  I did not certainly intend -- I would have -- in

21  retrospect, I would have filed a motion for leave in the two

22  days in between, and I would have -- would have -- or four days

23  in between, I would have done that, but I -- we were trying to

24  get this done.  We had everybody in -- in the office working on

25  reviewing documents and trying to get them completed.

1           THE COURT:  Okay.  All right.

2           Mr. Budwin, I'd like you to address the prejudice

3    issue that Mr. Barr was discussing.

4           MR. BUDWIN:  Yes, Your Honor.  Is it all right if I

5    stand at the podium so I can use --

6           THE COURT:  All right.  That's fine, as long as you

7    pull that mic towards you so that it can pick you up.

8           MR. BUDWIN:  So we got to where we are because of a

9    whole series of what I would characterize as discovery

10   shortcomings on the part of the Defendants.

11          Prior to the close of fact discovery, Sears had only

12   produced 9,600 documents, and Overstock had only produced 1,300

13   documents.  And this is in Footnote 2 of our opening brief, and

14   the documents counts are shown in my declaration attached

15   thereto.

16          Between October 2nd, that's the Court's deadline, and

17   October 24th, the Defendants collectively produced 207,000

18   documents, one and a half million pages.  So that means between

19   October 2nd and October 24th, Sears' production was five times

20   the size of its production during discovery, and Overstock's

21   production was 91 times the size of its productions during

22   discovery.

23          Now, I hear a lot -- this was in their brief, and

24   Mr. Barr alluded to it, as well.  This is our fault or at least

25   should be partially our fault because we didn't get them search

```
 1    terms soon enough.  Well, going back to May of 2012, and this
 2    is my slide here, we sent them correspondence asking for
 3    metrics and AB testing information.  Prior -- at May 16th, when
 4    we started following up with the Defendants on where are your
 5    documents, Sears had only produced 42 documents, and Overstock
 6    had only produced 336 documents.  So this is shortly before the
 7    doc -- the Court's substantial completion deadline.  They'd
 8    only produced a handful of documents each.  And we were
 9    complaining to them about that, Your Honor.
10            On the substantial completion deadline, which Your
11    Honor set for July 2nd, is when the Defendants produced what I
12    would characterize as the bulk of their document production,
13    their pre-ESI document production.  So this is July 2nd.  We
14    get the first meaningful document production from Overstock and
15    the first meaningful document production from Sears despite our
16    long-standing complaints.
17            We give them email ESI search terms within five days
18    of getting their first substantial document production, and
19    they didn't supplement their initial disclosures until June
20    20th.  So June 20, 2014, in response to our complaints, they
21    supplement their initial disclosures.  July 2nd, 2014, which is
22    the Court's substantial completion deadline, is when each of
23    the party -- each of Mr. Barr's clients make their first
24    meaningful document production, despite our complaints.
25            THE COURT:  Why was the ESI the -- well, why did you
```

```
 1    leave the ESI terms until that point in the schedule?

 2            MR. BUDWIN:  Your Honor, we didn't have -- we didn't

 3    know who the -- the likely custodians were going to be until

 4    June 20th, 2014, which is when Defendants supplemented their

 5    initial disclosures in response to our complaints.  And on July

 6    2nd, I have the document counts here, this is how many

 7    documents each of the Defendants produced, Overstock and Sears.

 8    July 2nd, 2014, was the first time either Sears or Overstock

 9    actually produced documents from their custodial files.  That's

10    the Court's substantial completion deadline.

11            Prior to the substantial completion deadline -- and

12    this is the document counts that I have here on my slide -- on

13    May 16th, Sears only produced 42 documents, and Overstock had

14    only produced 336.  And most of those documents were

15    productions of prior art and things of that nature.  There

16    wasn't a meaningful document production from the Defendants.

17    And this reference -- and we've got all of our correspondence.

18    We're complaining to Defendants' counsel in letters and emails

19    on a weekly, sometimes daily basis about these shortcomings and

20    identifying people in their initial disclosures and producing

21    documents in advance of the Court's substantial completion

22    deadline.  And as the Court says in the docket control order,

23    counsel are expected to make good faith efforts to produce all

24    required documents as soon as they are available and not wait

25    until the completion deadline.
```

```
 1          Well, Defendants here waited until the substantial

 2   completion deadline, and we reviewed every document that they

 3   produced and got them our initial search terms within five

 4   days, July 7th, for two of the Overstock custodians.

 5          It's very difficult to identify search terms and --

 6   and custodians in the absence of information from the

 7   Defendants.  And in our briefing, you'll see that we actually

 8   had some letters and even an interrogatory going to ESI

 9   custodians and -- and search terms and things of that nature

10   that were never responded to.

11          THE COURT:  All right.

12          MR. BUDWIN:  Now, this, I think, goes to our

13   prejudice.  We filed an earlier motion to compel, not the

14   motion to compel ESI, but the motion to compel metrics and

15   financial information on August 1st.  This is Docket 206.

16          In response to that, the Defendants told us they're

17   not withholding any relevant source code or financial

18   information.  August 20th, we filed a motion to compel ESI.

19   September 5th, we serve our opening expert reports.  So we're

20   serving our opening expert reports on September 5th with only a

21   handful of documents being produced from each of the Defendants

22   and no -- almost no metrics or testing or any of this other

23   type of information that we're asking for.

24          Now, we've talked a lot about representation that

25   Mr. Barr made to the Court at the hearing on the 18th.  But I
```

1    would point out that Defendants actually represented in their

2    opposition to our motion to compel email ESI, so this is their

3    opposition, Docket 231, on September 9th, that it would only

4    take them two weeks once the search terms were agreed upon.  So

5    for Overstock, that should have been September 12th, and for

6    Sears, that was September 23rd.  So this was a representation

7    they made to the Court in their opposition and that they made

8    to us in their opposition, and, obviously, this wasn't complied

9    with.

10           So then we come to the second representation at the

11   October 2nd hearing where they asked for two weeks, and the

12   Court grants it.  October 2nd is the deadline.  The deadline

13   comes, and Defendants never once told us at any point leading

14   up to the deadline that they wouldn't make the meeting.  They

15   didn't file anything with the Court, and they didn't tell us.

16   Instead, after the deadline was missed, we emailed them and

17   said, hey, guys, what's going on because we actually didn't get

18   any documents from them on October 2nd.  The Sears production

19   that Mr. Barr refers to was actually FedExed on October 2nd.

20   We didn't get it until the 3rd, but that's kind of a minor

21   issue.  And then that Sears drive was corrupted, and we had to

22   get a replacement one, but you can leave that aside.  We didn't

23   get any documents on the 2nd, and we had to go to them and say,

24   hey, guys, what's going on?

25           Now, we've gone through these -- kind of a stage of

1    how the documents were produced.  Let's get to our prejudice.

2    So prejudice from delay is presumed, and here, I would say it's

3    not just that they missed the Court's October 2nd deadline.

4    It's a series of discovery failures going back to the deadlines

5    that the Court set in its docket control order that have now

6    snow-balled into the situation that we're in.

7            The lack of these emails, metrics, and financial

8    information were very prejudicial to us in preparing our expert

9    reports, particularly our damages expert report.  There are

10   some documents that we found in our initial review of these 1.5

11   million pages that we think are very important that are

12   incredibly supportive of our damages methodology, and our

13   damages expert has actually now supplemented his report.  We

14   were working on this through the weekend and served a

15   supplemental report on Saturday for both Overstock and Sears.

16   And Defendants have yet to indicate to us whether they're going

17   to oppose our request to supplement those reports, and we're

18   doing this, preparing our damages supplemental report, against

19   the background of all of the other pre-trial deadlines.  As I

20   mentioned, we had four or five filings yesterday, in addition

21   to supplementing reports.  This is why the schedule is set the

22   way that it is.

23           The bottom line is we don't have time where we're at

24   now to use our usual process of reviewing documents, coding

25   them, putting them into witness files, and preparing reports.

```
 1   Our damages expert is still working through this volume of

 2   documents to see whether or not he needs to supplement again.

 3          I would also point out that the Defendants have these

 4   documents on their trial exhibit list, and we have documents on

 5   our trial exhibit list, and Defendants have actually objected

 6   to our identification of their late produced documents because

 7   we have been supplementing our trial exhibit list to include

 8   these additional late produced documents as we identify them.

 9   And they object to our supplementation of trial exhibits

10   because our supplementation is not timely as they allege.

11          Additionally, and as our damages expert shows in his

12   supplemental reports, we found well over a hundred million

13   dollars of additional revenue for at least Overstock.  We found

14   emails and comments from their CEO.  And as you'd expect, when

15   you get this volume of documents, there's a whole lot of things

16   that we've learned that had we known them earlier, had we known

17   them in the discovery period, we could have sought other

18   avenues of discovery that now because of where we are and the

19   pendency of this case, we can't.

20          And importantly, what we see throughout these emails

21   are the very metrics and AB test reports that we asked for in

22   2012 that we moved to compel initially and that Defendants said

23   didn't exist.

24          It's all through these emails.  And so Mr. Barr will

25   probably say, well, they're emails.  We didn't have to produce
```

1  emails, but they've got, just as I believe I represented to the

2  Court at the first motion to compel hearing, these Omniture and

3  other types of metrics tracking systems that measure how the

4  various features on the accused websites are used, and now we

5  see all these emails talking about this, but we haven't gotten

6  any meaningful document production of the actual underlying raw

7  data from those things.

8          And so we're putting together things that we see out

9  of these emails in our supplemental report, for example, that

10 had we had them in discovery, we could have taken more

11 effective depositions.  We could have prepared better our

12 expert reports initially.  You know, they're challenging our

13 damages expert report, and our survey for Daubert and all these

14 other reasons that we think maybe they wouldn't have had a

15 basis to challenge them for, and we could have done maybe a

16 little better or addressed some of their critiques.

17         The bottom line is when you get dumped 1 1/2 million

18 pages of documents within three months of trial, that's very

19 prejudicial.  Our team has been spending -- you heard Mr. Barr

20 talking about his team spending time.  Our team has been

21 spending a lot of time reviewing these documents.  We've been

22 spending a lot of money on our experts in supplementing their

23 reports, attorney time, our vendor in processing these things

24 and briefing and arguing these things at the hearing that we

25 shouldn't have even had a move to compel on.  So the prejudice

1  to us is real and substantial.

2          MR. BARR:  Your Honor, if I could briefly respond

3  to --

4          THE COURT:  Oh, I will give you an opportunity,

5  Mr. Barr.  Don't worry.

6          MR. BARR:  Thank you.

7          THE COURT:  And I'd like you to respond to that.  I'd

8  also like you to talk about the prejudice that you've alleged

9  that you refer to as the death penalty from striking those

10  witnesses.  Can you describe that to me a little further?

11          MR. BARR:  Well, first, Your Honor, I'd like to

12  address -- I think the Court's order was actually signed on

13  October 21st.  I remember now that it had come out after the

14  hearing, and so the order actually -- I didn't have that order

15  with the language in it we were just looking at when we were --

16  when we were doing this email production.  October 21st is when

17  the Court's order was signed and entered.

18          So what I was going on was our conversation down here

19  that day in the courtroom where, you know, the Court had said,

20  let's try to be as specific as we can, and the two of you

21  talked about what the Defendant needs and what the Plaintiff

22  needs to try to arrive at the date you've agreed upon for

23  production.  And then I explained the two weeks.  And then the

24  Court -- Your Honor said, well, okay -- well, unfortunately,

25  it's my job to make that more specific.  So if you want to

1   propose a date, and I'll -- you know, we can start with that,

2   or I can just pick a date.

3         And so I picked the date of two weeks, and then we

4   left.  And so the -- the order that the Court was looking at

5   about what the specific language -- that actually wasn't in

6   place.  We'd already done the production by the time that order

7   was signed.

8         THE COURT:  And -- and you understood the oral order

9   to be different from that?

10        MR. BARR:  Yes, sir, I -- I under -- the way I

11  understood this, Your Honor, to be honest when we were down

12  here was that we needed to get this done as quickly as we

13  possibly could.  You were going to take the date that I gave

14  you, and -- and we were going to put that down as when I'd get

15  it done.  But I certainly did not understand it at that time to

16  be a hard and firm, you know, order like the one that came out

17  on the 21st and that, you know, was going to be -- and it

18  didn't make me take it any less seriously, Your Honor.  We

19  certainly proceeded under the assumption that that was what you

20  wanted us to do.

21        But the order itself didn't come down until after we

22  had already produced all the documents, which, I think, would

23  explain why we didn't file a motion for leave.  I think if

24  there had been an order signed, I likely would have filed a

25  motion for leave.

```
 1          THE COURT:  All right.  What else?
 2          MR. BARR:  Secondly, in regard to the -- the -- the
 3   argument that counsel keeps making about taking depositions and
 4   doing things differently, that's just not accurate because
 5   discovery was over before we ever had ESI.  According to the
 6   docket control order in this case --
 7          THE COURT:  I think what he was talking about was that
 8   there were other documents, not emails, other documents
 9   referred to in the emails, that if he had had those, he could
10   have done his discovery differently.
11          MR. BARR:  He never would have had those, though,
12   under the docket control order until the ESI was completed.
13   Judge Craven's docket control order, which was Docket No. 73 at
14   Paragraph 8, was entered March 29th of 2012, and it ordered
15   that email production requests shall identify the custodian,
16   the search terms, and the time frame.
17          We never got those from the Plaintiff, despite the
18   fact that we had identified many, if not all -- certainly many
19   of the custodians who have now become important in our initial
20   disclosure responses.  So we didn't get any search terms for
21   those custodians, even though they had been filed -- or served
22   years prior.
23          THE COURT:  You -- you understand that a document can
24   be discoverable and you can have the obligation to disclose it
25   whether or not it's referenced in an email?
```

```
1            MR. BARR.  I certainly do.  But I -- but I also
2    understand that just because a document showed up in ESI and
3    Plaintiff now says it should have been produced doesn't
4    necessarily mean that it is relevant or that it would have been
5    found with the initial -- our understanding in our initial
6    disclosures of what the case was about.
7            They filed a 37,000-page infringement contentions in
8    this case, Your Honor.  It was hiding the ball and extremely
9    difficult for us to even figure out what functionalities were
10   accused in this case.
11           So I -- I don't think that it's reasonable for
12   Plaintiff to say that we should have anticipated because
13   they've now narrowed it down to five accused features from the
14   37,000 pages that they filed earlier that we would have
15   anticipated that some document, which he now says is critical
16   to his case -- and I'll note that his supplemental expert
17   report only refers to four documents, and that his -- four
18   after the privilege review, and that his survey expert didn't
19   refer to any of our documents, which -- so I don't see how that
20   would have had anything to do with his survey expert report in
21   any event.
22           THE COURT:  All right.
23           MR. BARR:  But as far as other discovery, the way that
24   the Plaintiff chose to do ESI in this case by not identifying
25   search terms to us until the summer of 2014 and by not
```

```
 1   identifying the specific terms as we went back and forth
 2   together until September of 2014, there's no way he could have
 3   done more discovery.  If he'd have done it differently, maybe
 4   he could have, but -- but waiting until the last minute, as
 5   they chose to do, has resulted in the situation that we have.
 6          And that's why we believe that if there's any
 7   prejudice that he argues, and we don't believe -- so -- so most
 8   of his argument to prejudice we don't think is valid because
 9   none of those things that he said he could have done, he
10   couldn't -- he couldn't have done any of them because it was
11   after discovery when he gave us the ESI terms.  So those are
12   invalid.
13          And we believe that any additional work that needs to
14   be done by an expert or any additional time that he needs to
15   review documents can easily be done if there was a short
16   continuance granted in this case, which we don't oppose.
17          And -- and as far as the witnesses go, the -- the
18   witnesses that he's asked to strike are all of our 30(b)(6)
19   witnesses, all of our witnesses that are the key executives of
20   the company who will be -- of both companies who will be
21   testifying at the trial of this case.  So all we'll have left
22   are expert witnesses.
23          THE COURT:  All right.
24          MR. BARR:  And at least in regard to Mr. Moore, we
25   provided his ESI before Plaintiff took his deposition because
```

1   that was the one that they asked us to move up the chain, and

2   we got it to them so they could use it and question him on it

3   at his deposition.

4          THE COURT:  All right.  Do you have anything else you

5   want to offer, Mr. Barr?

6          MR. BARR:  I don't believe so, Your Honor.  Well, my

7   counsel here has got --

8          THE COURT:  All right.

9          MR. BARR:  My co-counsel tells me that most of the ESI

10  came from two people, Sam Peterson, and this fellow GP with a

11  long Indian name that none of us can pronounce.  And those men

12  were both listed on our initial disclosures in 2012, and we did

13  not get search terms for them until July 29th of 2014.

14         THE COURT:  All right.

15         MR. BARR:  That's in regard to Overstock.

16         And -- and in regard to Sears, I believe most if not

17  all of the key ESI witnesses were also listed in our initial

18  disclosures back in 2012.  There were some additional witnesses

19  that were added as -- as the Court had asked us to provide

20  additional witnesses for deposition, and those witnesses were

21  not in the initial disclosures.  But they would not necessarily

22  have fallen under the category of witnesses for which ESI would

23  have been required in any event.

24         And in regard to the -- the argument about the

25  accounting documents, as the Court will recall, we provided

1   financial documents in -- in the regular discovery time.  It

2   was -- as the Plaintiffs had -- became more focused on what

3   they were seeking, and you'll recall the discussion we had that

4   the -- neither of these companies record revenue, they don't --

5   they don't make money off these features.  Sears and Overstock

6   sell things over the Internet.  They don't make money by

7   selling "Search Suggest" or "Mouse Hover Over Cart" which are

8   some of the features that are accused here.

9           There was a request that we had at the Court -- I

10  believe it was on September 18th, where counsel for the

11  Plaintiffs asked for additional metrics documents that were --

12  these were -- metrics are the things that the websites track

13  and they look at.  We produced additional metrics documents

14  related to that request, and I think those are the documents

15  that counsel is referring to now.  That was actually in the

16  August hearing.  And there have been depositions on those

17  documents certainly for -- for all of the parties.

18          So they've had opportunities to question the

19  witnesses -- 30(b)(6) witnesses which the Court asked us to

20  produce related to these so-called late produced revenue

21  documents, which really don't show revenue but are, in fact,

22  metrics.

23          Thank you, Your Honor.

24          THE COURT:  Thank you, Mr. Barr.

25          Mr. Budwin, is there anything else you want to put on

1    the record on your motions?

2            MR. BUDWIN:  Briefly, Your Honor, just on the request

3    for a continuance, obviously, we're opposed to that.  This case

4    has been pending since 2011.  We're ready for our trial.

5            And on a personal note and on part of the trial team,

6    my wife is pregnant.  The baby is due in February.  So a

7    continuance would be prejudicial to me personally and to my

8    representation of the client.  So we're -- we're opposed to

9    that.

10           And that's all.  Thank you.

11           THE COURT:  Okay.  Thank you.  All right.  I'm going

12   to put in writing the ruling so that there won't be any

13   misunderstanding about what it is, and I will excuse you all at

14   this time.  Thank you.

15           LAW CLERK:  All rise.

16           (Hearing concluded.)

17

18

19

20

21

22

23

24

25

1

CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9    _____          _____
     SHELLY HOLMES, CSR-TCRR                    Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/14

12

13

14

15

16

17

18

19

20

21

22

23

24

25